UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In re:

ANTHONY U. GIANNASCA,

    Debtor

Chapter 11
Case No. 11-19499-FJB

# DISCLOSURE STATEMENT REGARDING DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

I. INTRODUCTION

A.    General

    Pursuant to Fed. R. Bankr. P. 3016, Anthony Giannasca (the "Debtor") submits this Disclosure Statement (the "Disclosure Statement") in conjunction with the Debtor's Chapter 11 Plan of Reorganization (the "Plan"). The Plan will be referred to collectively in this Disclosure Statement and should be read in conjunction with each other and will collectively be referred to as the "Plan and Disclosure Statement" of the "Debtor". Portions of the Plan and Disclosure Statement which refer solely to the Plan of Reorganization will be referred to as the "Plan". The Disclosure Statement contains a description of the Debtor and his expectations for future operations and earnings. It also discusses the valuation of the Debtor's assets and alternatives to the Plan. Also included is a detailed description of the treatment and payment provisions for all creditors of the Debtor.

    On October 5, 2011, the Debtor filed a petition under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Massachusetts. On November 29, 2011, this Court allowed the Debtor's motion for conversion to relief under Chapter 11.

    During the case, the Debtor has maintained his business as a Debtor-in-Possession under Sections 1107 and 1108 of the Code.

    Pursuant to Section 1125 of the Code, this Plan and Disclosure Statement is being sent to all holders of claims against the Debtor so that the Debtor may solicit votes for the Plan and creditors may be provided with information concerning the Plan, the Debtor, and the prospect of future operations. In order for the Court to approve a disclosure statement, it must contain "adequate information", which means "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."

B.  BACKGROUND

The Debtor owns two (2) properties in Medford, Massachusetts. Further, the Debtor is a licensed electrician.

As to the real property, the Debtor's strategy was to acquire properties that will appreciate in value and provide positive cash flow. This strategy was working for the few years leading up to this filing. However, the properties needed repair and rental income declined. As a result, the Debtor became delinquent on the mortgages. Further, the Debtor owes various unsecured creditors.

Given the continued real estate market improvement, the Debtor seeks to reorganize the properties in order to address the financial difficulties incident to the current economic situation. From future rental income revenue, the Debtor proposes to pay his administrative creditors, priority tax claims, and secured creditors to the extent of the value of the collateral securing their claims as allowed under the Code.

II. TREATMENT OF LIABILITIES OF THE DEBTOR

The Plan divides creditors into classes and provides for the settlement and satisfaction of the various claims of creditors in each class. An analysis of the claims follows:

A.  Payment of Administrative Claims

Administrative Claims will be paid in cash, in full, on the later of the confirmation of the Plan (the "Effective Date" or "Confirmation") or the date they are allowed by an Order of the Bankruptcy Court. Ordinary trade and consumer debt incurred by the Debtor in the course of the Chapter 11 case will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and his trade and consumer creditors. The payments contemplated by the Plan will be conclusively deemed to constitute full satisfaction of Allowed Administrative Claims.

Administrative Claims include post-petition fees and expenses allowed to professionals employed upon Court authority to render services to the Debtor during the course of the Chapter 11 case.

In this case, the sole legal professional employed by the Debtor is Michael Van Dam, Van Dam Law LLP, as counsel to the Debtor. In order to be compensated, all professionals will have to apply to the Court for compensation and they will be paid that amount which the Court allows. It is estimated that administrative fees in the Debtor's case may be approximately $20,000.00 but that is only an estimate by the Debtor and actual fees may be higher than as represented. All fees are subject to approval of an Application for Compensation.

B.  Payment of Tax Claims

Priority Tax Claims: The Allowed Amount of any unsecured claim of a governmental unit entitled to priority under §507(a)(8) are as follows:

1. Internal Revenue Service         $23,765.57 (POC # 7)
   Internal Revenue Service         $3,925 (FY 2011)
2. Mass. Dept. of Revenue:          $9,903.92 (POC # 9)
   Mass. Dept. of Revenue           $1,725 (FY 2011)
   TOTAL                            $39,319.49

The Priority Claims shall be paid as follows:

- **At Effective Date**: Internal Revenue Service $13,845.29
     Mass. Dept. of Revenue:  $5,814.46
                              $19,299.75

- **Balance**:
  Internal Revenue Service: The Debtor shall pay $338.83 per month (inclusive of 4% interest) for forty-four (44) months from the Effective Date.

  Mass. Department of Revenue: The Debtor shall pay $142.29 per month (inclusive of 4% interest) for forty-four (44) months from the Effective Date.

Total Monthly payment for forty-four (44) months: **$481.12**

C.  Designation and Payment of Classes of Claims

**9 Joseph Street, Medford, Massachusetts (Residence)**

Class 1: Claims of One West Bank, FSB. Class 1 consists of the claim of One West Bank, FSB ("One West"). The claim is secured by a first mortgage on 9 Joseph Street, Medford, Massachusetts. The property has a value of $225,000. *See* Exhibit A. At the Petition Date, One West is owed $402,039.74 (POC #2).

The Debtor intends to surrender this property from the bankruptcy estate. Notwithstanding, the Debtor intends to seek a loan modification from One West. One West may be entitled to file a deficiency claim which would be treated under Class 3

Class 1 is impaired.

**16-18 Joseph Street, Medford, Massachusetts**

3

Class 2: Claims of One West Bank, FSB.  Class 2 consists of the claim of One West Bank, FSB ("OW").  The claim is secured by a first mortgage 16-18 Joseph Street, Medford Massachusetts.  *See* Exhibit A.  At the Petition Date, OW is owed $615,346.91 (POC# 3).  The property has a value of $407,000.

The claim of OW shall be modified as follows: (a) Payment of the secured portion of Class 2 shall be in accordance with existing promissory note from the Debtor to OW, modified to extend the maturity date of the loan to 30 years from the Effective Date, fix the principal loan amount to $407,000, to fix the interest rate to 5.0% per annum fixed (not variable) and to fix the monthly principal and interest payment under the note to $2,184.86.  This monthly payment shall be paid directly to OW.  Further, on an ongoing basis, the real estate taxes and insurance shall be escrowed by OW.

The Class 2 Claim holder shall retain its existing lien to secure the secured portion of its Claim.  Upon the Effective Date, the mortgage of OW shall be deemed modified as set forth herein and the Debtor may record the Confirmation Order to reflect said modification.  The modification shall be in force and the mortgage shall be deemed in good standing upon Confirmation as if there has been no default.  OW shall commence sending monthly statements to the Debtor reflecting the modified payments upon the Effective Date.  The unsecured portion of the claim of $208,346.91 shall be treated in accordance with the unsecured creditors, including voting rights, as set forth in Class 3 below.

Class 2 is impaired.

Class 3: Unsecured Claims.  Class 3 consists of (i) wholly unsecured claims of:

Beacon Electrical $7,456.11
Century Bank and Trust $58,546.81
Real Time Resolutions, Inc. $144,617.50 (POC # 6);

(ii)  Allowed Unsecured Claims, as scheduled or as filed and allowed by the Court, against the Debtor of whatever kind or nature which are not included in any other Class hereof totaling $138,753.06; (iii) undersecured claims of secured creditors set forth above in the amount of $208,346.91; and (iv) claims based on the rejection of the executory contracts or unexpired leases and claims for damages to person or property based on strict liability, negligence, or breach of a warranty, express or implied, relative to services rendered or products delivered by the Debtor.  These amounts total **$557,720** and holders of Class claims will receive on account of the Allowed amount of their claims a pro rata share of $5,000.00 on the Effective Date and $5,000.00 on each of the next four (4) anniversary dates of the Effective Date.  In sum, holders of Class 3 claims will receive in five (5) payments over the five (5) years from the Effective Date a pro rata share of a pool of cash totaling **$25,000 or 4.5%**.

Class 3 is impaired.

Class 4: The interests of the Debtor in property of the estate.  The property of the estate shall vest in the Debtor upon confirmation.

Class 4 is unimpaired.

D.      <u>Treatment of Executory Contracts and Unexpired Leases.</u>

The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not otherwise expressly assumed by motion or as otherwise stated herein.

The Debtor may file a motion or amend this Plan to reject any contracts and leases found to be executory prior to or after Confirmation as provided under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the Bankruptcy Code). If any party to an executory contact or unexpired lease which is deemed assumed pursuant to the Plan objects to such assumption, the Bankruptcy Court may conduct a hearing on such objections on any date which is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required by Section 365(b)(1) of the Bankruptcy Code will be made by the Debtor. In the event of a dispute regarding the amount of any such payments or the ability of the Debtor to provide for adequate assurance of future performance, the Debtor will make any payments required by Section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute.

All proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within thirty (30) days from and after the date of entry of an order of the Bankruptcy Court approving such rejection or such Claims will be barred. A creditor whose claims arise from rejection of executory contracts and unexpired leases will be treated as an unsecured creditor.

E.      <u>Payment of the Creditor Distribution Fund – Disposable Income from All Sources</u>

Prior to the commencement of the hearing(s) on Plan confirmation, the Disbursing Agent (as defined under the Chapter 11 Plan) will receive from the Debtor into the Creditor Distribution Fund an amount equal to fund payments to be made on the Effective Date stated below.

The source of payment in order to have cash on hand at the Effective Date shall be from cash accumulated by the Debtor during the pendency of this Chapter 11 case. These funds will be disbursed on the Effective Date by the Disbursing Agent as follows:

| | |
|---|---:|
| Administrative Fees (net of pre-petition retainers): | $10,000.00 |
| Priority Claims | $19,299.75 |
| Class 3 | <u>$5,000.00</u> |
| **TOTAL** | **$34,299.75** |

All quarterly disbursement fees, arising under 23 U.S.C. §1930 ("Quarterly Fees"), accrued prior to the confirmation shall be paid in full, on or before the date of confirmation of the Debtor's Plan, by the Debtor. All Quarterly Fees which accrue post-confirmation shall be paid in full on a timely basis by the Debtor prior to the Debtor's case being closed, converted, or dismissed.

F.    Ability of Debtor To Make Payments Called For Under the Plan

The Debtor will make the Effective Date payments from cash he has accumulated prior to the Effective Date.

The Debtor avers that the financial performance of the estate during the post-petition bankruptcy period is characteristic to the performance during the term of the Plan[1]. *See* Exhibit B for post petition analysis along with five (5) year projections.

Along with the electrician trade, the Debtor just obtained the necessary state licenses to professionally install HVAC. As a result, the Debtor projects an increase in business income.

Provision for Disputed Claims

The Debtor may object to the allowance of any Claims within 90 days of the Effective Date by filing an objection with the Bankruptcy Court and serving a copy thereof on the holder of the Claim in which event the Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by allowance of the Claim in whole or in part, the Debtor will make any payments in respect of such Allowance Claim in accordance with the Plan.

III.   VOTING AND CONFIRMATION

A.    General Requirements
In order to confirm a Plan, the Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including that: (1) the Plan has classified Claims in a permissible manner; (2) the Plan complies with the technical requirements of the Chapter 11 Code; (3) the proponent of the Plan has proposed the Plan in good faith; (4) the disclosures concerning the Plan as required by the Chapter 11 Code have been adequate and have included information concerning all payments made or promised by the Debtor in connection with the Plan; (5) the Plan has been accepted by the requisite vote of creditors, except, as explained below, to the extent that "cram-down" is available under Section 1129(b) of the Code; (6) the Plan is "feasible" (that is, there is a reasonable prospect that the Debtor will be able to perform its obligations under the Plan and continue to operate its business without further financial reorganization, except if the Plan contemplates a liquidation of the Debtor's assets); (7) the Plan is in the "best interests" of all creditors (that is, the creditors will receive at least as much under the Plan as they would receive in a Chapter 7 liquidation). To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met. Thus, even if the creditors of the Debtor accept the Plan by the requisite number of votes, the Bankruptcy Court must make independent

---

[1] The post petition performance does not incorporate the monthly mortgage payment expense.

findings respecting the Plan's feasibility and whether it is in the best interests of the Debtor's creditors before it may confirm the Plan. The Debtor believes that the Plan fulfills all of the statutory conditions of Section 1129 of the Code. The statutory conditions to confirmation are more fully discussed immediately below.

B.   Classification of Claims and Interests

The Code requires that a Plan of Reorganization place each creditor's claim in a class with other claims which are "substantially similar." The Debtor believes that the Plan meets the classification requirements of the Code.

C.   Voting

As a condition to Confirmation, the Code requires that each impaired class of claims accept the Plan. The Code defines acceptance of a Plan by a class of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of claims of that class, but for that purpose the only ballots counted are those of the creditors who are allowed to vote and who actually vote to accept or to reject the Plan. Persons who are considered "insiders," as that term is defined in Section 101 of the Code, may vote, but its vote is not counted in determining acceptance of the Plan.

Classes of claims that are not "impaired" under the Plan are deemed to have accepted the Plan. Acceptances of the Plan are being solicited only from those persons who hold Allowed Secured and Unsecured Claims that are impaired under the Plan. An Allowed Claim is "impaired" if the legal, equitable, or contractual rights attaching to the Allowed Claims of the class are modified, other than by curing defaults and reinstating maturity or by payment in full cash. A claim to which an objection is filed is not an Allowed Claim. However, the Court may allow such a claim for purposes of voting on the Plan. If you have not received an objection to your claim prior to Confirmation of the Plan and you have received a ballot for purposes of voting on the Plan, then most likely your claim is an Allowed Claim. If you have a question, you should consult your own attorney.

Ballots to be used for voting to accept or reject the Plan, together with a return envelope, are enclosed with all copies of the Disclosure Statement mailed to creditors entitled to vote on the Plan in accordance with the Code. Not all of the Debtor's creditors are entitled to vote in accordance with the Code (e.g., creditors in classes that are not impaired and holders of Claims and Interests in classes that are not scheduled to receive any distribution under the Plan.) Those creditors who are not impaired or hold Claims or Interests in classes that are not scheduled to receive any distribution under the Plan may receive a copy of this Disclosure Statement but are not entitled to vote. The Code provides that only certain classes are entitled to vote on the Plan.

If you are the holder of a Claim in an impaired Class you will receive a ballot for voting on the Plan. If you believe that you have an Allowed Claim or an Allowed Interest in more than one impaired class and did not receive more than one ballot, you should copy the ballot (or request additional copies from the undersigned counsel) and complete and return on ballot for each such separately classified Claim or Interest.

Completed ballots should be returned to Michael Van Dam, Van Dam Law LLP, 60 William Street, Wellesley, MA 02481. An envelope has been provided for this purpose with ballots sent to persons entitled to vote on the Plan. Ballots must be received on or before 4:00 p.m. (Prevailing Eastern Time) on _____, ____. Ballots received after the deadline will not be counted unless the Court so orders.

D.  <u>Best Interests of Creditors</u>

Notwithstanding acceptance of the Plan by creditors of each class, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all classes of creditors impaired by the Plan. The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired class of claims a recovery which has a value at least equal to the value of the distribution which each such creditor would receive if the Debtor was liquidated under Chapter 7 of the Code. Please see the discussion of liquidation value below.

   1.  Confirmation Without Acceptance by All Impaired Classes

Even if a plan is not accepted by all impaired classes, it may still be confirmed. The Code contains provisions for confirmation of a plan where at least one impaired class of claims has accepted it. These "cram-down" provisions are set forth in Section 1129(b) of the Code.

A plan of reorganization may be confirmed under the cram-down provisions if, in addition to satisfying the usual requirements of Section 1129 of the Code, it (i) "does not discriminate unfairly" and (ii) "is fair and equitable," with respect to each class of claims that is impaired under, and has not accepted, the plan. As used by the Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.

The requirement that a plan of reorganization does not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtor believes that its Plan does not "discriminate unfairly" with respect to any class of Claims.

The "fair and equitable" standard differs according to the type of claim to which it is applied. In the case of secured creditors, the standard is met if the secured creditor retains its lien and is paid the present value of its interest in the property which secures the secured creditor's claim.

IV.  <u>LIQUIDATION VALUATION</u>

To calculate what creditors would receive if the Debtor was to be liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if the Chapter 11 case were converted to a Chapter 7 case under the Code and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the assets of the Debtor augmented by the cash held by the Debtor.

The Liquidation Value available to general creditors would be reduced by (a) the claims of secured creditors to the extent of the value of its collateral, and (b) by the costs and expenses of the liquidation, as well as other administrative expenses of the Debtor's estates. The Debtor's costs of liquidation under Chapter 7 would include the compensation of trustees, as well as of counsel and of other professionals retained by the trustees; disposition expenses; all unpaid expenses incurred by the Debtor during the Chapter 11 case (such as compensation for attorneys) which are allowed in the Chapter 7 proceeding; litigation costs; and claims arising from the operation of the Debtor's business during the pendency of the Chapter 11 reorganization and Chapter 7 liquidation cases.

Once the percentage recoveries in liquidation of secured creditors, priority claimants, general creditors and equity security holders are ascertained, the value of the distribution available out of the Liquidation Value is compared with the value of the property offered to each of the classes of Claims under the Plan to determine if the Plan is in the best interests of each creditor and equity security holder.

The liquidation valuation of a business is often a contested issue in a Chapter 11 case. Two methods of valuation widely used are the so-called "auction" method and the "going concern" method. Using the auction approach, assets tend to be valued as though they were sold at a public auction and not in the use at the time of the sale. The auction method is widely used with tangible personal property such as trucks, trailers and tractors, assets which you can touch and feel and which are easily valued as a function of the initial purchase price and subsequent depreciation from use. The latter approach, the going concern method, tends to value assets based upon its contribution to earnings. The going concern method tends to be used with assets that tend not to suffer a decline from use such as accounts of a utility, maintenance contracts and the like. The Debtor believes that the proper measure of valuation for liquidation of its real estate business is the auction method. An orderly liquidation shall produce no proceeds new of secured creditors. It is likely that there would be no dividend for unsecured creditors.

All of the Debtor's Assets are either fully encumbered or exempt under the Bankruptcy Code. As such, under the Chapter 7 Liquidation analysis, the unsecured creditors would receive $0. *see* <u>Exhibit C</u>. Under the Plan, the creditors are receiving $25,000.

V.    <u>FEDERAL INCOME TAX CONSEQUENCES</u>:

Implementation of the Plan may result in federal tax consequences to holders of Allowed Claims. Tax consequences to a particular creditor may depend on the particular circumstances or facts regarding the claim of the creditor. No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan, and the following disclosure (the "Tax Disclosure") does not constitute and is not intended to constitute either a tax opinion or tax advice to any Person. Rather, the Tax Disclosure is provided for informational purposes only.

Because the Debtor intends to continue its existence and business operations, he will receive a discharge with respect to its outstanding indebtedness. Actual debt cancellation in

excess of the fair market value of the consideration (stock, cash or other property) paid in respect of such debt will hereinafter be referred to as a "Debt Discharge Amount."

In general, the IRC provides that a taxpayer who realizes a cancellation or discharge of indebtedness must include the Debt Discharge Amount in its gross income in the taxable year of discharge. The Debt Discharge Amounts may arise with respect to Creditors who will receive, in partial satisfaction of their Claims, including any accrued interest, consideration consisting of or including cash. The Debtor's Debt Discharge Amount may be increased to the extent that unsecured Creditors holding unscheduled claims fail to timely file a Proof of Claim and have their Claims discharged on the Confirmation Date pursuant to Section 1141 of the Bankruptcy Code. No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.

If a taxpayer is in a case under the Bankruptcy Code and a cancellation of indebtedness occurs pursuant to a confirmed plan, however, such Debt Discharge Amount is specifically excluded from gross income (the "Bankruptcy Exception"). The Debtor intends to take the position that the Bankruptcy Exception applies to it. Accordingly, the Debtor believes it will not be required to include in income any Debt Discharge Amount as a result of Plan transaction.

Section 108(b) of the IRC, however, requires certain tax attributes of the Debtor to be reduced by the Debt Discharge Amount excluded from income. Tax attributes are reduced in the following order of priority: net operating losses and net operating loss carry-overs; general business credits; minimum tax credits; capital loss carry-overs; basis of property of the taxpayer; passive activity loss or credit carry-overs; and foreign tax credit carry-overs. Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits, and foreign tax credits are reduced by 33.3 cents for each dollar excluded from gross income. An election can be made to alter the order of priority of attribute reduction by first applying the reduction against depreciable property held by the taxpayer in an amount not to exceed the aggregate adjusted basis of such property. The Debtor does not presently intend to make such election. If this decision were to change, the deadline for making such election is the due date (including extensions) of the Debtor's federal income tax return for the taxable year in which such debt is discharged pursuant to the Plan.

The federal tax consequences of the plan to a hypothetical investor typical of the holders of claims or interests in this case depend to a large degree on the accounting method adopted by that hypothetical investor. A "hypothetical investor" in this case is defined as a general unsecured creditor. In accordance with federal tax law, a holder of such a claim that uses the accrual method and who has posted its original sale to the Debtor as income at the time of the product sold or the service provided hypothetically should adjust any new operating loss to reflect the dividend paid by the Debtor under the Plan provided that holder previously deducted the liability to the Debtor as a "bad debt" for federal income tax purposes. Should that holder lack a net operating loss, then in accordance with federal income tax provisions, the holder should treat the dividend paid as ordinary income, again provided the holder previously deducted the liability to the debtor as a "bad debt" for federal income tax purposes. If the accrual basis holder of the claim did not deduct the liability as a "bad debt" for deferral income tax purposes, then the dividend paid by the Debtor has no current income tax implication. A holder of a claim

that uses a cash method of accounting would, in accordance with federal income tax laws, treat the dividend as income at the time of receipt.

THE DEBTOR MAKES NO REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR. EACH PARTY AFFECTED BY THE PLAN SHOULD CONSULT HIS, HER, OR ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO A CLAIM.

VI. FEASIBILITY

The Bankruptcy Code requires as a condition to Confirmation that the Bankruptcy Court find that liquidation of the Debtor or the need for further reorganization is not likely to follow after Confirmation. The Debtor has prepared financial projections and related schedules as evidenced on the accompanying exhibits. Those projections show that the Debtor is capable of operating well into the future and generating sufficient funds to perform its obligations in the Plan and continuing without the need for further financial reorganization.

VII. DISCLAIMERS

**THE CONTENT OF THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS PROVIDING ADEQUATE INFORMATION TO CREDITORS SO THAT THEY MAY HAVE SUFFICIENT INFORMATION TO VOTE ON THE PLAN. NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING THOSE RELATING TO ITS FUTURE BUSINESS OPERATING, OR THE VALUE OF ITS ASSETS, ANY PROPERTY, AND CREDITORS' CLAIMS, INCONSISTENT WITH ANYTHING CONTAINED HEREIN HAVE BEEN AUTHORIZED. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETE OR WITHOUT OMISSIONS. THE BANKRUPTCY COURT'S APPROVAL OF THIS PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION FOR OR AGAINST THE PLAN.**

**THE FINANCIAL INFORMATION CONTAINED HEREIN AND IN THE EXHIBITS ATTACHED HERETO HAVE NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE RECORDS KEPT BY THE DEBTOR ARE BASED UPON INTERNAL ACCOUNTINGS AND MANY VALUATIONS AND CERTAIN LIABILITIES HAVE BEEN ESTIMATED. CONSEQUENTLY, THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN OR IN THE PLAN IS WITHOUT ANY INACCURACY OR OMISSION, ALTHOUGH REASONABLE DILIGENCE HAS BEEN USED TO BE ACCURATE AND COMPLETE.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN IT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING**

**INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION ON HOLDERS OF CLAIMS.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THIS DATE UNLESS ANOTHER TIME IS SPECIFIED, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT WILL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WAS COMPILED.**

VIII.   EFFECT OF THE ORDER CONFIRMING THE PLAN

To understand the full effect of an order confirming the Plan you should read Section 1141 of the Code. The following is a summary of that Section:

A.   The provisions of the confirmed Plan bind the Debtor, any entity issuing securities under the plan, any entity acquiring property under the Plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the Plan and whether or not such creditor, equity security holder, or general partner has accepted the Plan.
B.   Confirmation of the Plan will act as an injunction against creditors seeking to collect upon their claims for so long as the Debtor remains current under the Plan.
C.   Except as otherwise provided in the Plan or the order confirming the Plan, only upon confirmation shall all of the property of the estate vest in the Debtor.

IX.   DEBTOR'S RECOMMENDATION

The Debtor is firmly convinced that his Plan is in the interest of all creditors. The Debtor strongly urges all creditors to cast their votes in favor of the Plan of Reorganization.

Each creditor is urged to consult with its own counsel in evaluating its claim and in determining how to vote.

          Respectfully Submitted,

          /s/ Anthony Giannasca
          Anthony Giannasca

          By his counsel,

|  | /s/ Michael Van Dam |
|---|---|
|  | Michael Van Dam, Esq. |
|  | BBO # 653979 |
|  | Van Dam Law LLP |
|  | 60 William Street, Suite 300 |
|  | Wellesley, MA 02481 |
|  | Tel: (617) 969-2900 |
|  | Fax: (617) 964-4631 |

Dated: January 7, 2012